Good morning, Your Honors. May it please the Court, Todd Moore on behalf of Mr. Gagnon Appellant. I want to start off this morning and say I would be very brief and reserve a major portion of my time to respond in rebuttal because it's a simple issue here and the issue is basically that the District Court's finding of an implied license is wrong. The implied license requires above all things that the delivery of whatever the subject matter is, in this case computer software, is delivered with the intent by the creator, in this instance Mr. Gagnon, it's delivered and once it's delivered they can use it without his involvement. And that cannot be construed as the fact in this case because the software, as indicated in the briefs and as recognized by the District Court, is in two forms. It's in its operations form where the computer code that the computer reads that's undecipherable to the individuals and then it comes in the source code which is a form that a programmer can utilize this. It is an undisputed fact that at the time of Mr. Gagnon's termination, AMS did not possess the source code. I thought it was kept on the server at AMS's facilities. Well, with respect to the source code being stored at AMS, that in itself didn't give access of the source code to AMS. Why is that? The situation, well, first of all, if you look at Mr. Gagnon... Let's just say they knew where it was. I guess that came later, but say they knew where it was, why would they not have had complete access to it? Because it's demonstrated by the fact that they had a forensic computer firm go in, look at their computers to determine what was on the computers, and after that forensic analysis of their computers, Mr. Ackerstein, one of the executives at AMS, sends a letter and says, we don't have the source code. We want it. We don't have it. Mike, I bet you're kind of dancing around the issue that I'm looking at. As I understand the record, the source code was physically located at AMS's facility. Is that correct? The source code at certain times was located at AMS's facility. When was it not there? Well, what we could do, we don't know that. According to the record, it was always there. Is that not correct? That is not correct. Where in the record does it say that it was located elsewhere? In Mr. Gagnon's declaration and the declaration of one of his employees, it indicates that the source code was on Mr. Gagnon's personal computer, and one of his employees had the full AMS database on his laptop. Was it likewise at the server at AMS headquarters, contemporaneously? It was, for the most part, at AMS on their computers, because it needed to be to operate the systems and change them. The systems needed to be modified. It was kept there as convenience, because Mr. Gagnon was involved with the program. So while you can say that there's delivery, okay, technically maybe you have some type of delivery because it is at AMS, AMS never possessed it. Yes, it was at times on their computers, but they couldn't gain access to it. How can that be, counsel, when the dispute rose to the point that Mr. Gagnon and AMS went their separate ways? People other than Mr. Gagnon ultimately found the source code were able to use it without his involvement. Isn't that correct? I don't know that they found it. Mr. Gagnon's employees always knew where it was. And it was at AMS. And it was at AMS on the computers. But I guess that gets into the issue of trade secrets. What kind of efforts did Mr. Gagnon make to protect that source code, which is typically a trade secret? Well, whatever he did with the relationship with employees and how it was stored at AMS, the fact is after looking at those computer drives, they couldn't find it. They admit that in their brief. And so I guess even if you say there's an implied license, is the source code still a trade secret in the manner of which it was stored? And it kind of jumps ahead into my argument, but I'll go there. Even if you have an implied license, it does nothing to defeat the misappropriation of trade secrets claim in this instance, because the source code itself is separate from the programs in a usable programmers form. And that source code is subject to more trade secrets inside. It has to be interpreted. There's design architecture. There's a lot that goes into the source code that only Mr. Gagnon and his employees knew. Now, the fact that the source code was readily ascertainable as a trade secret doesn't defeat the misappropriations claim, because if AMS... No, I do not think it has anything to do with the delivery in the sense for getting, I guess you would be going back to implied license. The delivery is just handing the soft source code or storing it on the computers doesn't constitute delivery for the purposes of an implied license, because now all of the case law indicates that creation and delivery is, yeah, there are factors we consider, but it's not major factors. The delivery is interpreted in the same context of the intent of the creator. Let me tell you a part of this that I don't get. Let's assume that Gagnon was paid good money to write this program and deliver it to AMS and did in fact do that. Yes. And they're using it and they're fat and happy and we decide that those facts constitutes a license to use, an unlimited license to use that software. Yes. Okay. I know that's not your position. I don't get then why there's any... It would seem to me that your trade secret claim automatically loses after that, because if they have the right to use the software, it doesn't matter really. And I respectfully disagree, and I think that when you look at the trade secret law, the defense becomes we have the software, we were entitled to use it to modify for our businesses, we don't have the source code, but we went out and we reverse engineered the software, we took the source code out of the software and converted it to a form then we could reprogram and modify it. The point of my question is if they have an unlimited, if we decide or if we conclude that they have an unlimited license to use that software because they paid for it and it was delivered, then what difference does it make? They don't have a right to the source code that was never delivered to them. They have a right to use that software. I think there's an argument that asset marketing makes that's kind of moot at this point because they didn't raise it at the district court, but it involves the Computer Licensing Act and what parties can do to software that they buy. They can modify it for the purpose which it was intended for. If, in fact, that's what you're getting at, yes, but they can't... I mean, if you said that they took the source code and then sold it to somebody else, then I could understand your claim a little better. But what I'm struggling with is if you buy the premise that they had a license, an unlimited license to use this stuff, and this other business about the source code seems to me almost irrelevant. Well, the source code is trade secret. The source code by itself... But if they have a license to use the software, what difference does it make? If they don't possess the source code and the source code is trade secret, then they have to obtain it by appropriate means. That's the purpose of the Trade Secrets Act in California. So it's money you're saying that they owe a payment for the source code? Is that what you're saying? No, what they bought was programs. If, in fact, you want to say what they bought, it's the programs. Okay, I understand. So if we agree with you on that issue, what do you get? What is your remedy? What do you get if you say they weren't entitled to the source code? What, didn't your client demand payment of millions of dollars in order to have access to the source code? In the course of negotiations, there were negotiations, he demanded some payment for the source code. So that's what it is. It's money. He wants to be paid for the source code. It's a money damages plan, because the source code goes in addition to the programs. He has a right to, as most computer programmers do, sell their programs, but retain the source code. That's what the Madison article in the briefs is about. But wouldn't the source code have to have been provided in order for the software to have been modified? Absolutely. And that's... So when the source code was provided for modification of the programs, why wasn't that a part of the license there? Because it was the programs were provided as part of Mr. Gagnon's management of the complete information system. He provided the programs with the understanding that he would manage the full IT system at AMS. But it wouldn't make sense to get a software program that wouldn't include the ability to modify it. It had to be tailored to the individual business. Yes, and I understand that. But you see, that's what we have in this situation. We have two contracting parties. And the fact that they didn't obtain, that would be asset marketing didn't obtain the source code, that's the kind of thing that, you know, is their problem. At the same time, the fact that Mr. Gagnon did things, those are his problems. But at the end of the day, they didn't have his trade secret source code. The question under the misappropriation trade secrets law becomes, how did they get it? His contracts with his employees are therefore legal because he has a right, just like anybody else, to protect his trade secrets. Did they interfere with those contracts? We don't know yet because we don't have some complete discovery issues. To really determine what's going on in this case, we have one more issue that was raised, and that's the issue of the discovery demands that weren't addressed. And there was some confusion down at the end. One of the magistrates retired. Another magistrate stepped in. But at no time was Mr. Gagnon allowed to file a formal motion to compel based on his discovery demands. There was a joint status report. And in the context of that, things happened. The motions for summary judgment came out. And then after everything was filed in September, I think, of 2005, and then in 2006, the magistrate came out with a report and said that request for that ex parte application to hold off on summary judgment until the discovery settled delayed the whole matter. Well, that's not necessarily true. And then the magistrate concluded that whatever that discovery issue was, it's not relevant to what's in front of the case or the district court. And that specifically is where's the source code? Let me ask you this. When did Mr. Gagnon ever express an intent to withhold a license to use this software without his future involvement until the time that he was terminated? Well, what happened was they went into a relationship to where he would do programming, manage their system, and he would... That was the technical services agreement, right? Well, that's not only the technical services agreement, but they were already in a relationship. Right. But the technical services agreement doesn't say anything about withholding any rights or ownership on his part, does it? No, it does not. But what I will say is this, it was always understood that Mr. Gagnon was to be involved with the use and modification of his programs. Understood by whom? By the parties. Mr. Gagnon. And is there something in writing to that effect, or that's just Mr. Gagnon's perspective on it? We have no written agreements other than the original agreement that they had. And what has happened is, in this instance, is Mr. Gagnon performed services and he modified the programs. That's the relationship that we had. We were implying their relationship from their conduct. Okay. The outside vendor agreement, which was never executed by AMS but was submitted by Gagnon... He, Gagnon, will allow AMS non-exclusive unlimited licensing of software developed for the company. I realize that was not signed, but what import, if any, does that have with respect to the intent of the parties with respect to a licensure? Well, if you just look at that specific statement that you made, it's not complete. And I would ask that if you read the clause, it also says he will give non-exclusive basis of all copyrights while performing services under the agreement. That's a double... See, you can interpret that and say, I'll give you unlimited license so long as I'm performing services under the agreement. Okay? And so that in itself gives his intent to remain involved. Okay. So you're saying that what I just cited here is incomplete and that his services were tied to that, right? Yes. If you look at page 8 of our opening brief, it indicates the complete thing. And he also maintains the possession of all source code and reserves all rights in that area. The last thing I would say is that with respect to the intellectual property, it's something that he always controlled, he and his employees and no one else. It constitutes a trade secret. And these are all issues of fact that are inappropriate for summary judgment. Thank you, Mr. Moore. Good morning. May it please the Court. Philip Samoris of Hicks, Fletcher & Mack here on behalf of Respondent. The 28-page order issued by Judge Napoleon Jones is entirely correct and should be affirmed. The undisputed evidence upon which Judge Jones based his ruling established without question the following facts. AMS requested each and every one of these programs from Mr. Gagnon. Mr. Gagnon specifically developed them for AMS to work specifically with AMS's database. AMS paid Mr. Gagnon over $2 million in compensation over those years, $250,000 of which specifically were linked to computer programming. Mr. Gagnon, despite his attempts to recreate the record, makes it absolutely clear that the computer programs were installed on AMS's computers, at AMS's proper level, AMS management, at full access. That's where the source code was as well, right? Exactly. Absolutely. It's exactly right. Mr. Gagnon clearly testified that he, when they moved to the new building in, I think it was 2002 after the death of the founder, they moved to a new office. It's a two-story office building in Scripps Ranch area of San Diego. At that time they moved there, it was Mr. Gagnon's instruction, and he knowingly permitted all of the source code development to occur at AMS, on AMS computers. And what's also important is Judge Napoleon Jones correctly found that AMS flipped the bill for most, if not all, of the development costs. They paid for the visual basic computer program, thousands of dollars. They paid for training for Mr. Gagnon to go and learn how to put together these programs. So not only do they have possession, but they flipped the bill for all of it. It's also undisputed that, to your question, Judge Smith, that he never told AMS, never told AMS that there was some withholding of rights that he was reserving. What about the splash screen? There was something in the record about a splash screen. I don't know at what time period it occurred, but what relevance, if any, does that have? Well, that was specifically addressed by Judge Jones, I believe correctly, and that is that, yes, you know, we look at it, we evaluate it, but in the totality of the circumstances it can't possibly be read to mean what appellant wants it to mean, which is some sort of clear warning that you wouldn't be entitled to use it. When did the splash screen, when did that first appear in this program? From my understanding it was from the beginning. I believe that to be the case. And did that have a reference to a copyright ownership on Mr. Gagnon's part? My understanding is it's just a simple basic copyright notice that we've all seen. It just has the circle C and it says Mr. Gagnon. It's inconceivable that he could have a copyright. That doesn't mean you don't have a license. And, in fact, Judge Jones' ruling is read that way. He found an implied license. He didn't make any adjudication as to copyright ownership. I mean, you might be violating the copyright if you were then to try to sell the program to somebody else, but the question is whether you folks had a license to use it. Let me ask you this. Is it theoretically possible that you could have had a license to have the software, to use the software forever, but not own the source code? Is that theoretically possible? You know, I guess, I hate to deal in hypotheticals, but you've asked it so I'll answer it. I guess in theory it could happen, but we have to deal with the facts of this case. Why didn't that happen here? Here, the way Judge Jones analyzed it correctly, I might add, is that it's not just the ultimate conclusion of an implied license that defeats the trade seeker claim. It's all the factual findings in this particular case that went into reaching that conclusion. It's the fact that delivery was made. It's the fact that the defendant actually had, AMS actually had possession. Of the source code. Of the source code. So then it becomes, and what, it's just obvious, under the body of law related to implied licensing and the factual determinations made by the trial judge in this case, which are undisputed, coupled with, I might add, very importantly, the Copyright Software Act of 1980, Section 117, which counsel has repeatedly asserted that it wasn't raised at the trial court level. That's simply not the case. As I'm sure your honors noticed in the record, there was a hotly contested motion to remand back to the trial court. So there was a second judge, Judge Rudy Brewster, who took a look at this motion for summary judgment. It was fully rebriefed, and another bite at the apple was taken by a separate judge. And as part and parcel of that argument, we made it clear at the trial court level, to the district court, that 117 was being asserted, and that there were fantastic cases that I only wish I had found sooner. But it's here now, and I think it's the right thing to do to look at these issues of law. Ames v. Bonelli is a case cited to the court. Crouse v. Titleserv, and in preparation for the hearing, I did a quick look on Shepherds. I found another one, Weitz v. Micro, 510 F sub 2nd, 1098. It's a Southern District of Florida case, 2007, which is another one of these cases that reads so much like this case, where a company pays a lot of money for a license, excuse me, for a program, only to have the computer programmer, I believe disingenuously at the last minute, try to extract additional payments. And they all, all of these cases, based on Section 117, knock it out of the ballpark. So when you look, to answer your question, Judge Silverman, when you look at the factual determinations that this court made based upon an undisputed record in order to reach an implied license, coupled with, I believe as a matter of law, the rights that are relayed as a matter of law to AMS under the Copyright Act, pursuant to important findings made by the National Commission on Technology Uses of Copyrighted Works. It was a, Congress created that commission, and I cited it to the trial court, and I've also referenced Docket Number 170. It's there for the court to pull up if it would like to take a look at it. When you take all of that into consideration, Judge Jones made the simple and inescapable conclusion that it's game, set, and match, folks. The trade secret does more. Mr. Moore indicated that because this was a factual issue, that the court couldn't determine that on summary judgment. That's inaccurate, is it not? Of course it's inaccurate. The undisputed record supports Judge Jones' findings 100%. If Judge Jones had your pleadings and Mr. Gagnon's pleadings, and there was summary judgment involved, and he made a determination that there was no material issue of fact that remained undecided, he could decide the case under summary judgment, right? Exactly. And Judge Brewster agreed with him at really the third bite at the apple, because he had already filed one motion for reconsideration with Judge Jones, which Judge Jones looked at on the merits to some degree, and then we came back again a third time to a second judge, who once again rebriefed it and came to the exact same conclusion. So if you're comfortable with the third set of judges, then I'm confident you'll find that the order is well-reasoned. It's based upon a correct reading of the record, and it should be affirmed. But just to hit home about this repeated concept that the source code was not delivered, I mean, he testified in his declaration in opposition to the motion for summary judgment, and he, Mr. Gagnon, testified that that's where it was stored, at the development room. We have a declaration from the employee, which is unbelievable. I understand his argument to be, yeah, it may have been on the computers there, but it was sort of, I don't know, hidden, or they didn't know where it was, or they didn't know how to extract it, and they had to hire basically a computer private detective to get to it, and so it wasn't really, you know, it may have been on the computers, but it wasn't turned over to them in that sense. And, Judge Silverman, I'm glad you raised that, because I think the very important issue that that relates to when we talk about delivery is control. Who controls the software? I mean, that's ultimately the issue. If you want to control your software, you pay for your own version of Visual Basic, you install it on your own computer at your own office, and you do your development work there. And then you go to the customer's location, and you install the code in a format or a fashion that protects you in some way, shape, or form. That way you retain control. In this case, his own testimony is that after the exit strategy had already been put into place, he issues this memo to his employees saying, oh, by the way, guys, I need to know where the code is. I'm paraphrasing it, but from here on out, I really need you to lock down the code and make sure that I have it. This is years later, after all the money's been paid. And according to his own testimony, when I asked him about that memorandum, he writes, and this is an excerpt of the record at page 56, it's at his deposition testimony, page 134, lines 4 through 8, answer, there was a lot of tension. This was done end of August, early September at least, and there was terrible tension. I don't believe Steven Schmidt or Ben Nye were at ACID anymore, and I was trying to get control of my software. And these cases that analyze implied licenses talk about just that, that if you're trying to retain control and you're sending the message to the client that this is mine, really the burden's on you to, number one, control it. Council, would you mind giving me the excerpt of record where that's found? Certainly. It's excerpt of record at page 56, and it's one of those multi-page depositions. So it's at page 134, line 4 through 8. And while I'm at it, I guess I could make sure the record's clear on other pieces of evidence that go to source code on AMS's computer. There's a declaration of Mr. Feld. That's the excerpt of record, pages 82 through 84. There's Mr. Gagnon's own testimony in the form of his declaration in opposition to the motion for summary judgment, where he specifically says that it was stored at the computer at the development room at AMS, which is excerpt of the record at page 144. That's lines 1 through 3. There's his deposition testimony where he confirms that his computer programmers were actually doing the programming at AMS on AMS computers. He confirms that at his deposition at pages, excerpt of record, page 49, which is specific deposition testimony is 88, line 25 through 89, line 16. There's also excerpt of record, page 56, which is deposition testimony, page 135, line 9 through 136, line 6. And then, of course, there's the testimony that I just read into the record a few moments ago, which leads me to the very interesting conclusion of, correct conclusion of Judge Jones, that when in that same declaration in opposition to the motion for summary judgment, Judge, Mr. Gagnon tries to make the very conclusive statement that I had control of my software at all times, is what he says. Judge Jones, at page 20 of his order, lines 24 through 28, rejects it. Says, based upon your own testimony, that's just not the case. Just the last point I want to make, Judge Smith, is you correctly asked counsel for the appellant to make the broad statement that there was some understanding all along that he retained some ownership, and I think you directly asked, understood by who, how? I asked that question at the deposition. It's cited in the appellate brief. He admitted on the record that he never had that discussion, and there was nothing, no word or deed done by AMS that would lead him to believe otherwise. It just wasn't there. That's the remainder of my time. Mr. Moore, you really used up your time, but if you can keep it to a minute, we'll give you a minute, but please watch the clock, okay? In respect to implied license, delivery is not the issue. It's the intent of the creator. If delivery exclusively was the issue, all of the cases, for example, with the architectural plans, everyone that was involved, the architect, gave them the plans. The intent was the same. How does that manifest in this case? In this case, Mr. Gagnon and his employees are the only ones that modified the software. Did they communicate that before his termination to AMS? Well, they communicated, we're looking at implied contact, there was nothing written. He's the only one that had access to it. And I will shift to 117 and this last point. They cite title serve as a case for 117. In that case, the facts are similar to this case. What the court found, it's not whether or not they had the source code, but it's the matter in which they obtained it becomes the issue for misappropriation. Trade secrets. They had the software, but they didn't have the source code. How did they get it? That became the question of fact that made summary judgment inappropriate. Thank you. Thank you.
judges: Silverman, Rawlinson, Smith